[Cite as *Westlake v. Knowles*, 2025-Ohio-3277.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

| | | |
|---|---|---|
| CITY OF WESTLAKE, | : | |
| Plaintiff-Appellee, | : | Nos. 114517 and 114518 |
| v. | : | |
| DOMINIQUE L. KNOWLES, | : | |
| Defendant-Appellant. | : | |

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** September 11, 2025

Criminal Appeal from the Rocky River Municipal Court
Case Nos. 24 CRB 0249 and 24 CRB 0250

*Appearances:*

Michael P. Maloney, City of Westlake Law Director, and
John F. Corrigan, Assistant Prosecutor, *for appellee*.

Wargo Law, LLC, and Leslie E. Wargo, *for appellant*.

JILL FLAGG LANZINGER, J.:

{¶ 1} Defendant-appellant Dominique Knowles ("Knowles") appeals her convictions for endangering children following a bench trial. For the following reasons, we affirm.

**Factual and Procedural History**

{¶ 2} On February 23, 2024, Knowles was charged in three separate cases — 24 CRB 249, 24 CRB 250, and 24 CRB 251 — in Rocky River Municipal Court. Each case charged Knowles with a single count of endangering children in violation of R.C. 2919.22, a first-degree misdemeanor, and each count related to one of Knowles's three minor daughters: ten-year-old J.B. and seven-year-old twins S.T. and T.T.

{¶ 3} Knowles initially pleaded not guilty, and a bench trial took place on October 9, 2024.[1] At the outset of trial, the City of Westlake ("the city") dismissed Rocky River M.C. No. 24 CRB 251, related to J.B., without prejudice. Also at the outset of trial, defense counsel informed the court that Knowles was moving to request a new attorney and a continuance of trial. Knowles stated that she wanted new counsel based on a conversation she had with her attorney the day before. The trial court denied the motions, and Knowles subsequently stated that she was dissatisfied with her counsel because she wanted to call the guardian ad litem who worked on her children's juvenile court case as a witness in her criminal trial. The trial court reiterated its denial of the motions.

{¶ 4} The city called seven witnesses. The first four witnesses were staff members at the girls' elementary school. T.T.'s first grade teacher testified that in May 2024, at the end of the school year, T.T. qualified for an individualized

---

[1] The trial was originally scheduled for September, but Knowles failed to appear and a capias was issued.

education plan ("IEP") based on her needs. Next, S.T.'s first grade teacher testified that she had an IEP in place when she started first grade, and the school psychologist subsequently evaluated S.T. and determined that she had an IQ level that classified her as intellectually disabled.

{¶ 5} The city also called the elementary school counselor, who testified that she was familiar with the twins and saw both on a regular basis at school. The counselor testified that the girls' teachers had reached out to her because the twins "were reporting that food orders were being [delivered] to the house and that Mom wasn't there and that their older sibling was taking care of them." (Tr. 48.) The counselor testified that the school reached out to its contact at Cuyahoga County Division of Children and Family Services, but a couple days later, when it appeared nothing had been done, one of the school's teachers reached out to the Westlake Police Department.

{¶ 6} The city also called the elementary school's intervention specialist, who testified that she managed the implementation of S.T.'s IEP. The city introduced the audio recording of the phone call the intervention specialist made to Westlake police seeking a welfare check on the girls. All four staff members testified that based on their experience, they did not believe it was safe or appropriate for seven-year-old children to be left without adult supervision.

{¶ 7} Next, the city called Westlake Police Officer Anne Smith ("Smith"), who testified that she conducted a welfare check on the girls on the evening of February 22, 2024. Smith testified that she knocked on the door of the girls'

apartment and J.B. answered the door; the twins also came to the door. Smith testified that she asked J.B. if there was a parent or other adult that she could call; J.B. told Smith that Knowles was "out of town or out of the apartment" and that J.B. had been taking care of the twins since the previous morning, February 21, 2024, which was the last time that J.B. had seen Knowles. Smith testified that there was a camera system set up in the kitchen, and the girls told her that Knowles could use it to watch them and communicate with them, but it was one-way communication and they had no way of reaching out to Knowles through the camera. The girls also had a laptop that they could use to FaceTime Knowles, but when Smith arrived, it was not charged.

{¶ 8} Smith testified that J.B. did not have Knowles's phone number memorized and could not spell Knowles's last name, but J.B. located Knowles's passport, which police dispatch ultimately used to identify Knowles's phone number. Smith testified that a police dispatcher called Knowles and instructed her to contact Smith; Smith also sent Knowles a text message. In the meantime, the girls received a FaceTime call on the now-charging laptop from their grandmother, Deborah Sullivan ("Sullivan"). During the FaceTime call, Smith obtained a phone number for Sullivan and proceeded to call her. Smith testified that Sullivan told her that Knowles was at a Cleveland-area hospital with a friend who had surgery, but the surgery was complicated and taking longer than anticipated, and that Sullivan was on her way to the apartment. Smith testified that at the end of the call she could

hear that Sullivan was driving. Smith proceeded to tell the children to go back into the apartment, lock the door, and wait for their grandmother.

{¶ 9} The city also called Westlake Police Dispatcher Judy Knis ("Knis") as a witness. Knis testified that she received a phone call from the intervention specialist requesting a welfare check on the girls. In response to that call, Knis dispatched Smith and another officer to conduct a welfare check. Knis also testified that she identified a phone number for Knowles, called her, and requested that Knowles call Smith. At trial, the city played an audio recording of Knis's phone call to Knowles.

{¶ 10} Finally, the city called Westlake Detective Ronald Boots ("Boots"), who testified that he began working on this case the morning of February 23, 2024. After some additional investigation by other officers, Knowles was arrested on February 26, 2024. Boots testified that he interviewed Knowles after her arrest. During the interview, Knowles stated that J.B. knew the Heimlich maneuver and had a cell phone to use for emergencies. Boots testified that he sent a preservation request to Knowles's cell phone service provider, and based on Knowles's phone records, he was able to determine the location of numerous phone calls Knowles made between February 21 and February 23, 2024. Boots testified that Knowles made several phone calls in the area of Cleveland Hopkins International Airport shortly after 8:00 p.m. on February 21. The next phone call Knowles made was shortly before midnight in Miami, Florida. Over the next day, Knowles's phone made around 50 connections with cell sites in the Miami area. Boots testified that

the phone records also reflected that Knowles received a call from the Westlake Police Department shortly after 7:00 p.m. on February 22 — when dispatcher Knis called Knowles while Smith was conducting a welfare check on the children — and Knowles's phone connected to a Miami cell tower to receive that call. Boots testified that the next phone call Knowles made, immediately after receiving the call from Knis, was a call to her mother, Sullivan. Boots testified that around 9:00 a.m. on February 23, 2024, Knowles received a call in the area of the Miami International Airport; the next phone call Knowles made was in the area of the Cleveland airport around 11:30 a.m. The city introduced a PowerPoint presentation prepared by Boots explaining his analysis of the aforementioned phone records, as well as the phone records themselves.

{¶ 11} Boots was also able to use a license plate reader system to identify the car Knowles said she was driving. The car was located at the intersection of Detroit and Columbia Roads in Westlake at 4:01 p.m. on February 21, 2024; the car was not identified in Westlake again until 9:04 a.m. on February 25, 2024, near Crocker Road and the highway.

{¶ 12} At the end of Boots's testimony, the city rested. Defense counsel made a Crim.R. 29 motion for acquittal; the trial court denied the motion. Knowles called Tianna Wilson ("Wilson") as a witness in her defense. Wilson testified that she had known Knowles for about ten years, and Wilson's children and Knowles's children were friendly and would play together. Wilson testified that she was scheduled to have liposuction in Miami in February 2024, and the person who was

supposed to accompany her was unable to go, so she asked Knowles to accompany her to Miami. Wilson testified that Knowles arrived in Miami on Wednesday evening, February 21, and Wilson dropped Knowles off at the Miami airport in the early morning hours on Friday, February 23, 2024, for Knowles's return flight to Cleveland.

{¶ 13} Knowles also called Adiva Carroll ("Carroll"), who testified that she had been friends with Knowles for around ten years and knew her children well. Carroll testified that in February 2024, she lived in the apartment building next door to Knowles and her children and would see them regularly. Carroll testified that J.B. had a cell phone and would sometimes call her. Carroll testified that she did not know that Knowles was out of town in late February 2024, but she knew that Knowles was not at home. Carroll testified that on the evening of February 21, after Knowles left, Carroll checked on the children and made sure they had eaten and gone to bed. Carroll also testified that the children caught the bus to school outside of their apartment building. While Carroll did not see the children off to school on the morning of February 22, she testified that at around 4:00 p.m. that afternoon, she visited the apartment and made sure that the children had returned home safely from school.

{¶ 14} Knowles also called her mother, Sullivan, as a witness on her behalf. Sullivan testified that she typically saw Knowles's children multiple times a week and she would frequently go to their apartment in Westlake. She testified that she was already on her way to see the children on February 22 when she realized the

police were there; Sullivan could not remember if Knowles called her to tell her to check on the children. Sullivan testified that she knew that Knowles was "going to the doctors" and just assumed this was in Cleveland; she did not know that Knowles was in Florida. Sullivan testified that she believed J.B. could care for her younger sisters; J.B. knew the Heimlich maneuver and knew how to cook.

{¶ 15} Finally, Knowles testified on her own behalf. She testified that at some point on February 21, 2024, she went grocery shopping. Knowles testified that before she left that evening, she made sure that the girls had picked out their clothes for school the next day and went to bed. Knowles testified that she went to Florida because Wilson was nervous about having surgery alone; she stated that Wilson bought her plane tickets and she left Cleveland Wednesday night and returned to Cleveland Friday morning.

{¶ 16} Knowles testified that when the police contacted her on Thursday, she was nervous because she thought something had happened. Knowles testified that she immediately called Sullivan and asked her why she was not with the girls. Knowles testified that she did not have any reason to believe her children would be in danger when she was in Florida. Knowles testified that she believed her children were safe, and she had multiple cameras in the apartment that she used to check on them while she was gone. Knowles testified that she believed Carroll would come over to the apartment to check on the children because she usually did that daily. Knowles further testified that she did not expressly tell Carroll or Sullivan that she was going to be in Florida.

{¶ 17} Defense counsel renewed the Crim.R. 29 motion for acquittal. The court again denied this motion. After the parties made closing arguments, the court took a brief recess. Ultimately, the court found Knowles guilty of both counts of child endangering.

{¶ 18} On October 23, 2024, the court held a sentencing hearing. The prosecutor, defense counsel, Knowles, and an officer from the probation department addressed the court. The court sentenced Knowles to five years of probation with various terms and conditions and ordered her to pay fines and costs in both cases.

{¶ 19} Knowles filed a notice of appeal in both cases, and this court consolidated them for review. Knowles raises the following three assignments of error, verbatim, for our review:

> I. The trial court deprived appellant of her constitutional right to new counsel and effective assistance of counsel and erred in denying her a continuance of the trial.
>
> II. The trial court erred in overruling appellant's Rule 29 motion and by finding appellant guilty of two counts of child endangerment because the convictions are against the sufficiency of the evidence.
>
> III. The trial court erred in overruling appellant's Rule 29 motion and by finding appellant guilty of two counts of child endangerment because the convictions are against the manifest weight of the evidence.

**Law and Analysis**

**I. The Right to Counsel and Motion to Continue**

{¶ 20} In Knowles's first assignment of error, she argues that the trial court erred when it denied her request for a continuance of trial and that the trial court deprived her of her constitutional right to counsel when it denied her request for

new counsel. Immediately prior to the start of trial in this case, Knowles made an oral motion to the court for a new attorney to be appointed for her and, relatedly, for a continuance of trial. In support of her request for new counsel, Knowles stated her counsel had said something to her the previous day that resulted in her wanting a new attorney. Further, Knowles told the court that her counsel had not subpoenaed a critical witness — the guardian ad litem who had been involved in the juvenile case that had been dismissed.[2]

{¶ 21} The decision to grant or deny a motion for continuance is left to the broad and sound discretion of the trial judge, and an appellate court may not disturb the trial court's ruling absent an abuse of discretion. *Cleveland v. Graham*, 2014-Ohio-3413, ¶ 15 (8th Dist.), citing *Cleveland v. Washington*, 2013-Ohio-367, ¶ 11 (8th Dist.), citing *State v. Unger*, 67 Ohio St.2d 65 (1981). "A reviewing court determines on a case-by-case basis whether the trial court's denial of a continuance motion was so arbitrary as to deprive the defendant of due process, paying particular attention to the reasons presented to the trial judge at the time the request was denied." *Id*. at ¶ 16.

{¶ 22} Likewise, "'[w]e review a trial court's decision whether to remove court-appointed counsel for an abuse of discretion.'" *State v. Robinson*, 2018-Ohio-285, ¶ 7 (8th Dist.), quoting *State v. Pendergrass*, 2017-Ohio-2752, ¶ 15 (8th Dist.), citing *State v. Patterson*, 2014-Ohio-1621, ¶ 19 (8th Dist.). "There is a presumption

---

[2] The Cuyahoga County Division of Children and Family Services became involved with Knowles as a result of the incidents described in this case; that case was dismissed and it is not a part of the record in the instant appeal.

of bad faith that must be overcome if the request for new counsel is made on the day of trial." *Id*. at ¶ 8, citing *Pendergrass* at ¶ 16. The court's inquiry into a motion to appoint new counsel may be brief and minimal while still safeguarding the offender's constitutional rights. *Id*. at ¶ 10.

{¶ 23} Here, Knowles moved for the appointment of new counsel, or to continue trial to retain counsel, on the day of trial. In support of this motion, she made a vague reference to an unsatisfactory conversation she had with her counsel the day before. The fact that the motion was at least partially based on such conversation with counsel that took place the day before trial may overcome the presumption that the delayed motion was made in bad faith. Even if the motion was not made in bad faith, however, the record does not reflect that the trial court's denial of Knowles's motion for new counsel was an abuse of discretion. Further, Knowles argues that her counsel failed to subpoena a witness. Knowles stated that the guardian ad litem came to her house and talked to her children; the record contains ample testimony from other individuals who spoke with Knowles's children, including responding law enforcement officers, Knowles's mother, and Knowles herself. The record also contains evidence including the phone call made by S.T.'s teacher requesting a welfare check, body camera footage of the welfare check on the children, and body camera footage of Knowles's arrest. Knowles does not point to any way in which she was prejudiced by the failure to subpoena this witness. Therefore, the trial court did not abuse its discretion in denying Knowles's motion for new counsel.

{¶ 24} Knowles does not make any independent argument as to the trial court's denial of her motion to continue; both before the trial court and in her appellate brief, the motion to continue is based on a presumption that Knowles's request for new counsel would be granted. Had the trial court granted Knowles's request and appointed new counsel, a continuance would have been necessary. Because it did not, however, there was no other basis to grant a continuance. Therefore, the denial of the motion to continue was not an abuse of discretion.

{¶ 25} Knowles's first assignment of error is overruled.

## II. Sufficiency of the Evidence

{¶ 26} In Knowles's second assignment of error, she argues that the trial court erred in overruling her Crim.R. 29 motion for acquittal because her convictions were not supported by sufficient evidence. Specifically, she argues that the city failed to present sufficient evidence to prove beyond a reasonable doubt that Knowles violated her duty of care, created a substantial risk of harm to S.T. and T.T., and was reckless.

{¶ 27} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 2009-Ohio-3598, ¶ 12 (8th Dist.). An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the

crime proven beyond a reasonable doubt.'" *State v. Leonard*, 2004-Ohio-6235, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 28} With a sufficiency inquiry, an appellate court does not review whether the prosecution's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 2009-Ohio-3375, ¶ 25 (8th Dist.), citing *State v. Thompkins*, 1997-Ohio-52, ¶ 36 (Cook, J., concurring). A sufficiency-of-the-evidence argument is not a factual determination, but a question of law. *Thompkins* at ¶ 23. Proof of guilt may be supported "by circumstantial evidence, real evidence, and direct evidence, or any combination of the three, and all three have equal probative value." *State v. Rodano*, 2017-Ohio-1034, ¶ 35 (8th Dist.).

{¶ 29} Knowles was found guilty of two counts of endangering children in violation of R.C. 2919.22(A), which provides in relevant part:

> No person, who is the parent, guardian, custodian, person having custody or control, or person in loco parentis of a child under eighteen years of age or a child with a mental or physical disability under twenty-one years of age, shall create a substantial risk to the health or safety of the child, by violating a duty of care, protection, or support.

{¶ 30} No degree of culpability is included in R.C. 2919.22(A); the Ohio Supreme Court has held that the mens rea for the offense is recklessness. *State v. Wilson*, 2024-Ohio-2951, ¶ 16 (4th Dist.), citing *State v. McGee*, 1997-Ohio-156, ¶ 9. Further, R.C. 2901.01(A)(8) defines a "substantial risk" as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." *Id.*

{¶ 31} Following a thorough review of the evidence in this case, we find that the city presented sufficient evidence that Knowles violated a duty of care to her children, created a substantial risk to their health or safety, and acted recklessly.

{¶ 32} The evidence presented at trial showed that Knowles left her seven-year-old children under the "supervision" of her ten-year-old child for multiple days while she left the state without telling anyone. Leaving her young children without adult supervision for a prolonged period of time created a substantial risk of harm.

{¶ 33} In cases where child endangerment is based on an alleged lack of supervision, the age of the children involved is a relevant factor for courts to consider. Knowles points to a case in which a child endangering conviction, involving a ten-year-old boy who had wandered into his neighbor's backyard and swimming pool, was reversed for insufficient evidence in part due to the child's age. *State v. Gurung*, 2024-Ohio-3202 (1st Dist.). In *Gurung*, unlike the instant case, the ten-year-old child was not tasked with caretaking two younger children.

{¶ 34} Another factor courts consider is the length of time the children were unsupervised. In *Gurung*, the ten-year-old child was left unsupervised for less than 45 minutes. *Id.* at ¶ 25. Unlike *Gurung* and the numerous cases cited therein, the children in this case were left without adult supervision for two nights. Knowles does not point to any caselaw for her argument that leaving children unsupervised for multiple nights does not violate a duty of care or create a substantial risk to the children.

{¶ 35} Viewing the evidence in the light most favorable to the city, there was sufficient evidence for a reasonable factfinder to conclude that Knowles violated her duty of care, and recklessly created a substantial risk of harm to her children. For these reasons, Knowles's second assignment of error is overruled.

### III. Manifest Weight of the Evidence

{¶ 36} In Knowles's third assignment of error, she argues that the trial court erred in finding her guilty of endangering children because her convictions were against the manifest weight of the evidence. Knowles generally reiterates the arguments made in support of her second assignment of error.

{¶ 37} "Weight of the evidence concerns 'the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. . . . Weight is not a question of mathematics, but depends on its effect in inducing belief.'" *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 12, quoting *Thompkins*, 1997-Ohio-52, ¶ 24.

{¶ 38} In a manifest-weight-of-the-evidence challenge, sitting as the "thirteenth juror," the court "looks at the entire record and '"weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."'" *State v. Brown*, 2025-Ohio-2804, ¶ 30, quoting *Thompkins* at ¶ 25, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). Further,

reviewing courts will vacate a verdict and order a new trial "only in the exceptional case in which the evidence weighs heavily against the conviction." *Id*. at ¶ 31.

{¶ 39} Much of Knowles's argument against her convictions centers on the fact that her children were appropriately dressed, well-fed, and made it to school on time. While these conclusions are supported by the record, they are largely irrelevant to the child-endangerment offense at issue in this case. The relevant inquiry is whether the weight of the evidence supports the trial court's conclusion that Knowles violated her duty of care and created a substantial risk of harm for her children when she left them unsupervised for multiple days while she was in a different state.

{¶ 40} Knowles also argues that her children were mature, responsible, and capable of caring for themselves for days without supervision. The record reflects that none of the girls could spell their mother's last name; they did not know their mother's phone number, or the names or phone numbers of other adults in the area who were purportedly checking in on them; they did not have a way of affirmatively reaching their mother, or anyone else; and although they had a laptop capable of making FaceTime calls, it was not charged when police conducted a welfare check.

{¶ 41} Finally, Knowles is correct that there is no evidence that the children were physically harmed while she was in Florida. However, the fact that the girls managed to avoid harm does not negate the substantial risk Knowles created when she left them alone for two nights. This is not the exceptional case in which the trier

of fact clearly lost its way. For these reasons, Knowles's third assignment of error is overruled.

{¶ 42} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the municipal court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
JILL FLAGG LANZINGER, JUDGE*

MICHAEL JOHN RYAN, P.J., and
KATHLEEN ANN KEOUGH, J., CONCUR

(*Sitting by assignment: Jill Flagg Lanzinger, J., of the Ninth District Court of Appeals.)