[Cite as *State v. Canales*, 2026-Ohio-2408.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                               :

    Plaintiff-Appellee,               :

    v.                                           :

DARWIN CANALES,                          :

    Defendant-Appellant.            :

No. 115519

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** June 25, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-24-696432-A

---

***Appearances:***

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Michael R. Wajda, Assistant Prosecuting Attorney, and Sophie E. Kormos, Certified Legal Intern, *for appellee*.

Michael P. Maloney, *for appellant*.

ANITA LASTER MAYS, J.:

{¶ 1} Defendant-appellant Darwin Canales ("Canales") appeals from his convictions, following a bench trial on two counts of endangering children in violation of R.C. 2919.22(B)(3). For the reasons that follow, we affirm.

## I. Facts and Procedural History

{¶ 2} On October 23, 2024, a Cuyahoga County Grand Jury returned a 12-count indictment naming Canales and his codefendant Kaleca Kish ("Kish") as defendants. Canales was charged in Counts 1 through 6. Counts 1, 2, and 3 charged endangering children in violation of R.C. 2919.22(B)(3), felonies of the third degree, naming as victims Ke.K. (d.o.b. Sept. 22, 2017), Ki.K. (d.o.b. Dec. 24, 2018), and J.K. (d.o.b. Dec. 18, 2019), respectively. Counts 4, 5, and 6 charged endangering children in violation of R.C. 2919.22(B)(4), felonies of the third degree, naming the same three children as victims. The offenses were alleged to have occurred on or about December 1, 2023, through March 27, 2024. Counts 7 through 12, charging intimidation of a victim and retaliation, were directed solely at Kish.

{¶ 3} Canales pleaded not guilty at arraignment. On May 21, 2025, Canales executed a written waiver of his right to trial by jury, and the trial court accepted the waiver and ordered the matter to proceed as a bench trial.

{¶ 4} Because the three child witnesses were each under the age of ten, the trial court conducted in-chambers competency hearings on the record on May 1, 2025. All counsel of record, a Cuyahoga County child advocate, and the judicial staff attorney were present, and defense counsel waived the presence of their clients. The trial court questioned each child individually, with the agreement of counsel that the court would conduct the questioning in its entirety.

{¶ 5} During the competency examination of J.K., who was then five years old, the court asked the child a series of questions about his daily life, family, and ability to distinguish truth from lying. J.K. stated his first and last name, his age, identified his preschool teacher by name, and reported that he liked to play and that his favorite food was watermelon. Tr. 75-77. J.K. described receiving presents at Christmas, including a race car, and identified the color of his favorite car as blue. Tr. 79-80. He identified each of his siblings by name, including half-siblings he had recently met after moving in with his biological father. Tr. 81. J.K. nodded his head in response to certain questions concerning counting and his ABCs. Tr. 82. When asked about telling the truth, J.K. told the court that a lie is bad, that when he lies, he gets in trouble, and that he wanted to tell the truth rather than lie. Tr. 83-85. By journal entry dated May 19, 2025, the trial court found each of the three children competent to testify, concluding that each child was able to verbally demonstrate the ability to observe, remember, and communicate events, understood the concept of truth and falsehood, recognized the obligation to tell the truth, and understood that a negative consequence would occur upon a failure to tell the truth.

{¶ 6} The matter proceeded to bench trial before the trial court. The State presented testimony from Cuyahoga County Division of Children and Family Services ("CCDCFS") investigator Leah Najfach ("Najfach"), CCDCFS special investigator Tammy Wagner ("Wagner"), preschool teacher Catera Shanks ("Shanks"), victim advocate Jasmine Carr ("Carr"), Detective Daniel Flannery ("Det. Flannery") of the Cleveland Police Department, and the three child witnesses, Ke.K.

(age 7), Ki.K. (age 6), and J.K. (age 5). For ease of reference, and consistent with how the parties identified the children below, the children are referenced in this opinion as the oldest child, the middle child, and the youngest child, with the youngest child being J.K.

{¶ 7} Najfach testified that she was assigned a referral of suspected abuse in March 2024 and that the initial report concerned the children being unkempt and exhibiting suspicious injuries, mostly bruising. Tr. 137. Najfach went to the home on East 67th Street in Cleveland, where Kish lived with the three children. Tr. 135-137. When no one answered the door, Najfach left a voicemail, and Kish later returned the call denying the allegations, telling Najfach that there was nothing wrong with the children, and telling her that CCDCFS would not be permitted to see the children. Tr. 151. Najfach described Kish as aggressive and on edge during the call. Tr. 151.

{¶ 8} On March 12, 2024, Najfach returned to the home, by prearrangement with Kish and Canales, to conduct a face-to-face welfare check. Tr. 142, 152-154. Canales and Kish refused to permit Najfach to interview the children individually or outside their presence, and Najfach was required to interview the children as a group with both Canales and Kish in the room. Tr. 155. Whenever Najfach asked the children questions about discipline or what they had to eat, the children would look to Kish before answering, and Kish would interject. Tr. 155-157. Najfach examined the children head to toe, including with their shirts lifted. Tr. 145. Najfach testified that she was unable to complete a true interview of

the children at that visit, that she believed the children were not speaking out of fear of Kish, and that she left the home with concerns about physical abuse. Tr. 143-148, 155, 159. Najfach then transferred the investigation to the Special Investigations Unit. Tr. 148, 159.

{¶ 9} On March 27, 2024, Najfach returned to the home with Special Investigator Wagner to remove the children. Tr. 148-150. Najfach reported to staff at MetroHealth Hospital that one or more of the children had been severely punished and exhibited marks or bruising. Tr. 158-159. Najfach also photographed the interior of the home, including the basement area. Tr. 162-163. Najfach described the basement as having no place to sit, no comforting items, no access to food, and no toys, with a dirt floor that was not tiled or even concrete. Tr. 176-177, 182-183. The basement had no furniture, no heat, and no bathroom. Tr. 176. Najfach, who is taller than the children, was unable to reach the single ceiling light bulb in the basement. Tr. 185-186.

{¶ 10} Wagner, an investigator with the CCDCFS Special Investigations Unit, testified that she took over the investigation and visited the home to attempt to speak with the children alone. Tr. 267, 277-278. Kish again refused to permit Wagner to interview the children individually. Tr. 277-278. Wagner observed that the oldest child looked to Kish in apparent fear before answering certain questions, and Wagner became sufficiently concerned that she scheduled forensic interviews for all three children to be conducted that same day at the child advocacy center, a deviation from standard practice. Tr. 278-279.

{¶ 11} Wagner conducted multiple forensic interviews with each child over the course of several months. Tr. 268-269, 326. Recordings of those interviews were played in their entirety in court during Wagner's testimony and admitted as exhibits. Tr. 270-288. In an initial interview, the youngest child, J.K., told Wagner that Kish and Canales, whom J.K. referred to by his nickname "Filo," locked him in the basement and would not permit him to bring a blanket. Tr. 283-284. The middle child entered the interview room and immediately stated that "nothing happened," before Wagner had asked any questions. Tr. 287-288. A short time later in the same interview, the middle child disclosed that Kish and Canales physically abused her by striking her with belts on her legs, arms, and thighs, and that Kish and Canales beat the children because the children did not always go to bed on time. Tr. 290-291, 294. The middle child further reported that Kish had beaten her on the day Najfach visited the home, accusing her of having lied to Najfach, and that Kish had instructed her to tell Wagner that nothing happened, threatening that she would not be permitted to visit her grandmother for Easter if she did not comply. Tr. 291-293.

{¶ 12} Wagner also interviewed Kish on that date, and Kish admitted to whooping the children. Tr. 306. Wagner testified that following the youngest child's interview, victim advocate Carr reported that Kish had been on a speakerphone call with Canales in the presence of the other two children and had told Canales and the children that she was going to "beat their asses for lying" when they left. Tr. 488-491, 494. As the family was leaving the child advocacy center, Wagner observed Kish rushing the children to the car without securing them in seatbelts and then speeding

out of the parking lot, turning the corner at East 30th and Payne without stopping. Tr. 307-308, 496. Wagner placed a 911 call requesting a wellness check and obtained a telephonic order of removal, contacting the Cleveland Police Department for assistance in removing the children. Tr. 307.

{¶ 13} Removal took several hours because Kish refused to cooperate, would not answer the door, and ordered the children to stay away from the windows so that they would not be seen. Tr. 308-309. Wagner testified that during the standoff Canales hid under the bed. Tr. 376. After several hours, Kish released the children, who were transported to MetroHealth for physical examinations and then released to their biological father. Tr. 310.

{¶ 14} Following removal, Wagner conducted additional forensic interviews with each of the children. Tr. 326-327. With the children no longer in the home with Kish and Canales, additional disclosures were made. The youngest child disclosed that he had been bitten by a mouse while locked in the basement, and the middle child disclosed that she had been bitten by a spider in the basement. Tr. 327-328. The middle child also disclosed that Kish had beaten her with two belts at the same time, holding her own belt in one hand and Canales's belt in the other, and that this occurred on multiple occasions. Tr. 328. Wagner further testified that both the youngest child and the middle child sustained injuries when Kish threw them across the floor. Tr. 331. All three children eventually disclosed ongoing abuse by Kish and Canales. Tr. 375. Wagner acknowledged on cross-examination that the MetroHealth records did not reflect that there were belt marks on the youngest child

or that he had scarring on his wrist and that she personally observed no marks or injuries on the oldest child. Tr. 357-359.

{¶ 15} Shanks testified that she was a preschool teacher at Growing Youth Day Care Center from the summer and fall of 2023 through May 2024. Tr. 400. The three children attended Growing Youth Day Care throughout that period, and Shanks had daily contact with each of them. Tr. 405-406. Shanks observed marks and bruising on the middle child and the youngest child, and she photographed those injuries. Tr. 408-409. Shanks testified that the children would arrive at daycare with different bruises and marks each week, including marks the size of fingers, one shaped like a hand, and smaller welt-like bruises that were longer in shape. Tr. 419-420. Shanks observed a pattern in which the children would return on Monday following a weekend, or following a break, with significantly more bruises. Tr. 420. The daycare staff began documenting the injuries, taking photographs, and recording the children's explanations of how the marks occurred. Tr. 417-419, 432.

{¶ 16} Shanks further testified that the youngest child, on separate occasions, arrived at daycare with a swollen upper lip, a large dark purple bruise behind his ear, red and inflamed fingers, and what Shanks believed to be a broken nose. Tr. 427-431, 466. When the youngest child arrived with the injury to his nose, daycare staff had to clean off dried blood. Tr. 476-477. Shanks testified that her concern at that point was such that she did not believe the children should return home. Tr. 466. Shanks also expressed concerns about neglect, observing that the

children arrived at daycare hungry, disheveled, in dirty clothes or the same clothing as the previous day, and rarely dressed appropriately for the weather. Tr. 434. The daycare staff purchased toothbrushes for the children out of concern about the absence of dental-hygiene supplies at home. Tr. 419. Shanks's observations of bruising were largely concentrated between October 30, 2023, and December 15, 2023. Tr. 408-414, 441. On certain occasions, the middle child told Shanks that Kish had whooped her with a belt and that Kish had thrown her. Tr. 418, 421.

{¶ 17} The oldest child, then seven years old, and the middle child, then six years old, testified that Kish and Canales whooped them with a belt and locked them in the basement. Tr. 515-517, 522, 558-559, 564. The oldest child and the middle child both described being struck on the buttocks, legs, and arms, and described the basement as cold and dark, with no blankets permitted, mice that were dead and alive, and being kept there for long periods of time. Tr. 525-527. The middle child testified that Canales beat her along with Kish and identified Canales by his nickname "Filo." Tr. 528-529, 570-572.

{¶ 18} The youngest child, J.K., then five years old, testified briefly, stating that Kish was "mean" and "kept whooping us" with a belt. Tr. 592-593, 603. The youngest child did not identify Canales as an abuser during his trial testimony.

{¶ 19} Det. Flannery of the Cleveland Police Department testified that he had not visited the home, had not taken photographs, had not interviewed the children, medical personnel, relatives, or neighbors, and had not himself obtained the children's medical or counseling records. Tr. 623. Det. Flannery did interview

Kish but did not testify about the substance of that interview.  Tr. 623.  He interviewed one or more daycare workers in March 2025, approximately one year after the children had been removed from the home.  Tr. 635.

{¶ 20} At the close of the State's case, Canales, who represented himself at trial, moved for a judgment of acquittal pursuant to Crim.R. 29.  The trial court granted the motion as to Counts 3 and 6, the counts naming J.K. as the victim, and denied the motion as to the remaining counts.  Tr. 727.

{¶ 21} At the conclusion of the bench trial, the trial court found Canales guilty of Counts 1 and 2, endangering children in violation of R.C. 2919.22(B)(3), felonies of the third degree, with respect to the oldest child and the middle child. The trial court found Canales not guilty of Counts 4 and 5, endangering children in violation of R.C. 2919.22(B)(4).

{¶ 22} On August 14, 2025, the trial court proceeded immediately to sentencing.  The trial court advised Canales of postrelease control for a mandatory minimum of one year, up to a maximum of three years, and stated that it had considered all required factors of the law and found that prison was consistent with the purposes of R.C. 2929.11.  The trial court imposed a one-year prison term on Count 1 and a one-year prison term on Count 2, to be served at the Lorain Correctional Institution.  Tr. 738-739.  The trial court ordered the two counts to run consecutively, for an aggregate prison sentence of two years.  Tr. 738-739.

{¶ 23} In imposing consecutive sentences, the trial court found that consecutive service of the prison terms was necessary to protect the public from

future crime or to punish Canales, that consecutive sentences were not disproportionate to the seriousness of Canales's conduct and to the danger he posed to the public, and that at least two of the multiple offenses were committed as part of one or more courses of conduct and the harm caused by the multiple offenses was so great or unusual that no single prison term would adequately reflect the seriousness of the conduct, or that Canales's history of criminal conduct demonstrated that consecutive sentences were necessary to protect the public from future crime by Canales. The trial court granted Canales one day of jail-time credit, declared him indigent, waived all costs, supervision fees, and fines, ordered no contact with the victims, and appointed appellate counsel.

{¶ 24} Canales filed a timely notice of appeal and assigns two errors for review:

> 1. The trial court erred in denying appellant's rule 29 motion as to counts one and two of the indictment where the state presented insufficient evidence on the elements of endangering children; and

> 2. The trial court erred in allowing the juvenile victim J.K. to testify where said witness was incompetent.

## II. Crim.R. 29 Motion

{¶ 25} In his first assignment of error, Canales contended that the trial court erred in denying his Crim.R. 29 motion for acquittal on Counts 1 and 2 because the State failed to present sufficient evidence of the elements of endangering children under R.C. 2919.22(B)(3). Specifically, Canales argued that the State did not establish that his conduct created a substantial risk of serious physical harm to either the middle child or the oldest child.

**A. Standard of Review**

{¶ 26} A Crim.R. 29 motion for acquittal tests the sufficiency of the evidence. An appellate court reviews the denial of a Crim.R. 29 motion under the same standard used to review a challenge to the sufficiency of the evidence. *State v. Miller*, 2023-Ohio-1141, ¶ 27 (8th Dist.). When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.*; *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. A sufficiency challenge raises a question of law, and an appellate court does not assess witness credibility or weigh the evidence when conducting that review. *Westlake v. Knowles*, 2025-Ohio-3277, ¶ 14 (8th Dist.).

{¶ 27} A child endangering conviction may rest on a single rash decision or on a course of conduct demonstrating that a parent or person in loco parentis recklessly placed a child's health or safety at risk. *State v. Lucas*, 2024-Ohio-842, ¶ 66 (8th Dist.).

**B. Law and Analysis**

{¶ 28} Counts 1 and 2 charged Canales with endangering children in violation of R.C. 2919.22(B)(3), which prohibits any person from administering

> corporal punishment or other physical disciplinary measure, or physically restrain[ing] the child in a cruel manner or for a prolonged period, which punishment, discipline, or restraint is excessive under the circumstances and creates a substantial risk of serious physical harm to the child.

{¶ 29} To sustain a conviction under R.C. 2919.22(B)(3), the State was required to prove that Canales (1) administered corporal punishment or a physical disciplinary measure, or physically restrained the child in a cruel manner or for a prolonged period; (2) that the punishment, discipline, or restraint was excessive under the circumstances; and (3) that the conduct created a substantial risk of serious physical harm to the child. R.C. 2919.22(B)(3); *Miller* at ¶ 24.

{¶ 30} The State was not required to prove that the children in fact sustained serious physical harm. The plain language of R.C. 2919.22(B)(3) requires only that the excessive punishment or restraint create a "substantial risk" of serious physical harm. R.C. 2901.01(A)(8) defines "substantial risk" as "a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." Accordingly, Canales's repeated argument that none of the children required hospitalization or formal medical treatment was not dispositive. The relevant question was whether the conduct described in the record created a strong possibility of serious physical harm to the middle child and oldest child.

{¶ 31} Viewing the evidence in the light most favorable to the State, the record contained substantial evidence supporting both elements of excessiveness and substantial risk of serious physical harm. The oldest child testified that Canales and the children's mother "whooped" the children with a belt and that the children were locked in the basement as punishment. Tr. 515-517, 522. The middle child similarly testified that Canales and the mother struck her with a belt and confined

her to the basement. Tr. 558-559, 564. Both children further described being confined to the basement for long periods of time. Tr. 525-527. The oldest child testified that the whippings happened too many times to remember. Tr. 522.

{¶ 32} Tammy Wagner, the special investigator with the CCDCFS, testified that the children disclosed during forensic interviews that Canales and their mother beat them with belts, sometimes simultaneously with two belts, and locked them in the basement for extended periods. Tr. 290-291, 328. The middle child disclosed that she was bitten by a spider while confined in the basement, and the youngest child disclosed being bitten by a mouse in that same space. Tr. 327-328.[1]

{¶ 33} The trier of fact also heard testimony describing the conditions of the basement in which the children were confined. Wagner and the investigating caseworker, Najfach, both testified that the basement had a dirt floor, no heat, no furniture, no bathroom, no access to food or water, and a single overhead light bulb that the caseworker could not reach. Tr. 176-177, 182-183, 185-186. The basement was infested with live and dead mice. Tr. 527. The children were not permitted to take blankets or pillows with them and were at times forced to sleep in those conditions. Tr. 526, 575. Najfach testified that there was nothing in the basement for the children to sit on and "no comforting items down there." Tr. 176-177.

---

[1] Canales was not convicted of any offense relating to the youngest child. The trial court granted his Crim.R. 29 motion as to Counts 3 and 6, the counts naming the youngest child as the victim. Tr. 727. The youngest child's disclosure is recounted here only as part of the totality of the circumstances describing the conditions of confinement to which all three children were subjected, and not as proof of the counts of conviction, which pertained solely to the middle child and the oldest child.

{¶ 34} The preschool teacher, Shanks, testified that she observed bruises, welts, and marks on the children over a period of months and that the marks followed an identifiable pattern, with new injuries appearing after weekends and breaks from daycare. Tr. 408-409, 419-420. Shanks described welt-shaped, linear bruises consistent with strikes from a belt, as well as bruises shaped like fingers and a handprint. Tr. 420. Photographs documenting these injuries were admitted at trial. Tr. 408-414. The middle child told Shanks on more than one occasion that she had been struck with a belt. Tr. 418, 421. At trial, the older two children's father testified that he learned that the children had been diagnosed with PTSD and depression. Tr. 601, 602, 608, 611-612.

{¶ 35} Taken together, this evidence permitted a rational trier of fact to conclude that Canales repeatedly struck the middle child and oldest child with a belt as a means of corporal punishment and that he and the children's mother locked the children for prolonged periods in a cold, unfinished, rodent-infested basement with no heat, no bedding, no bathroom, and no access to food or water. A reasonable trier of fact could readily find that striking small children, ages four through six during the relevant time, with belts on the legs, arms, and thighs to the point of leaving repeated welts and bruising was excessive corporal punishment under the circumstances. *See Miller*, 2023-Ohio-1141, at ¶ 36-38 (8th Dist.). A reasonable trier of fact could likewise find that locking children of that age in a dirt-floored, unheated basement crawling with mice, without blankets, food, water, or access to

a bathroom, constituted physical restraint in a cruel manner and for a prolonged period within the meaning of R.C. 2919.22(B)(3).

{¶ 36} A reasonable trier of fact could further find that this combined conduct, the repeated belt strikes and the prolonged confinement under those conditions, created a substantial risk of serious physical harm. The strikes were of a force and frequency that left visible, lasting welts and bruises on small children. The conditions of confinement exposed the children to vermin, cold, and deprivation of basic necessities, and in fact resulted in a mouse bite to one child and a spider bite to another. R.C. 2919.22(B)(3) does not require that the harm risked actually materialize, only that the conduct create a strong possibility of serious physical harm. *Lucas*, 2024-Ohio-842, at ¶ 66 (8th Dist.).

{¶ 37} Canales relied heavily on *State v. Ivey*, 98 Ohio App.3d 249 (8th Dist. 1994), in which this court reversed convictions under R.C. 2919.22(B)(3), holding that a belt whipping that produced a bruised eyelid, bruises, welts, and lacerations on a ten-year-old child's buttocks and lower legs did not create a substantial risk of serious physical harm where the child was examined and released without medication and attended school the next day without incident. *Ivey* at 255-256. This court has continued to follow *Ivey* on that question. *See Miller*, 2023-Ohio-1141, at ¶ 62-63 (8th Dist.) (following *Ivey* in holding that a teenager's extensive bruising did not constitute serious physical harm). Canales's reliance on *Ivey* is nonetheless misplaced, because the conduct here was materially more severe and was not limited to corporal punishment. *Ivey* involved a single disciplinary incident

directed at one ten-year-old child. *Ivey* at 251-252, 256. Here, by contrast, the trier of fact heard evidence of repeated belt strikes, occasionally with two belts at once, inflicted on young children over a sustained period, coupled with prolonged confinement in a cold, dark, rodent-infested basement without heat, bedding, food, water, or a bathroom — confinement that in fact resulted in a mouse bite to one child and a spider bite to another. That confinement under those conditions has no counterpart in *Ivey* and, independent of the belt strikes, supported a finding that Canales physically restrained the children in a cruel manner and for a prolonged period, creating a substantial risk of serious physical harm. The combination of conduct in this case stands well apart from the discrete disciplinary incident addressed in *Ivey*.

{¶ 38} Construing the evidence in the light most favorable to the State, as the sufficiency standard requires, a rational trier of fact could find each element of R.C. 2919.22(B)(3) proven beyond a reasonable doubt as to both the middle child and oldest child. The trial court therefore did not err in denying Canales's Crim.R. 29 motion as to Counts 1 and 2.

{¶ 39} Therefore, Canales's first assignment of error is overruled.

### III. Juvenile Victim Testimony

{¶ 40} In his second assignment of error, Canales argues that the trial court erred in finding the youngest child, J.K., competent to testify and in permitting him to take the stand. Canales contends that the State failed to demonstrate that J.K. possessed the requisite indicia of competency under Evid.R. 601.

**A. Standard of Review**

{¶ 41} Evid.R. 601(A) provides that every person is competent to be a witness except as otherwise provided in the rules. When a child under the age of ten is offered as a witness, the presumption of competency does not apply and the trial court must conduct a voir dire to determine whether the child is competent to testify. *State v. Clark*, 71 Ohio St.3d 466, 469 (1994). In making that determination, the trial court considers the child's ability to receive accurate impressions of fact, the child's ability to recollect those impressions, the child's ability to communicate what was observed, the child's understanding of truth and falsity, and the child's appreciation of his or her responsibility to tell the truth. *Id.*

{¶ 42} Because the trial court has the opportunity to observe the child's demeanor and assess his or her responses firsthand, the trial court is vested with broad discretion in determining a child's competency to testify. *State v. Simmons*, 2024-Ohio-3188, ¶ 39 (8th Dist.); *State v. Bright*, 2024-Ohio-2803 (8th Dist.). Absent an abuse of discretion, a trial court's competency determination will not be disturbed on appeal. *Simmons* at ¶ 39. An abuse of discretion connotes a decision that is unreasonable, arbitrary, or unconscionable. *Id.*

**B. Law and Analysis**

{¶ 43} At the time of trial, J.K. was five years old. Tr. 68. Because he was under the age of ten, the trial court conducted a competency voir dire before permitting him to testify. The court engaged J.K. in an extended colloquy that

touched on his family, his daycare, his teacher, his siblings, his favorite foods and activities, his recent birthday, and his understanding of truth and falsity. Tr. 75-86.

{¶ 44} During that voir dire, J.K. stated his first and last name and his age. Tr. 75. He identified his preschool teacher by name and correctly identified her as female. Tr. 76-77. He described his favorite activities, his favorite food, and the color of watermelon, and explained that someone had to cut the watermelon for him. Tr. 77. He told the court that he received presents on Christmas, identified his most recent present as a race car, and described how he played with it on a track and what his favorite color of car was. Tr. 79-80. He identified each of his siblings by name, including half-siblings he had only recently met after being placed with his biological father. Tr. 81. He recalled having a birthday party with a cake and described what he had eaten for breakfast that morning and who had prepared it. Tr. 81, 86.

{¶ 45} The trial court also questioned J.K. about the difference between the truth and a lie. J.K. told the court that a lie is "bad" and that when he lied, he got in trouble and received a "whipping." Tr. 83. When the court asked whether he wanted to lie or tell the truth, J.K. answered "truth." Tr. 83-84. He further indicated that he would tell the truth when he testified. Tr. 74.

{¶ 46} Canales emphasizes other portions of the voir dire in which J.K. shook his head, said he did not know his birthday, did not know when Christmas was, did not say his ABCs, and did not count to ten on demand. Tr. 64, 69, 71-74. The trial court, however, was in the best position to observe J.K.'s demeanor, to evaluate whether his nonresponses reflected genuine incapacity or the natural

shyness of a five-year-old child in a courtroom, and to weigh those moments against the substantive answers he provided about his family, his daily life, his memory of past events, and his understanding of truthfulness. The competency inquiry does not require a young child to perform academic tasks such as reciting the alphabet or counting; it requires the court to assess whether the child is able to receive and recall accurate impressions, communicate them, and appreciate the obligation to tell the truth. *Clark*, 71 Ohio St.3d at 469. The record reflects that J.K. did each of those things during voir dire. On this record, we cannot say that the trial court's competency determination was unreasonable, arbitrary, or unconscionable. *Simmons*, 2024-Ohio-3188, at ¶ 39.

{¶ 47} Independently, any error in permitting J.K. to testify was harmless. Canales was acquitted of every count of the indictment that related to J.K., specifically Counts 3 and 6. His convictions on Counts 1 and 2 pertained only to the two older children, both of whom testified directly that Canales and their mother whipped them with a belt and locked them in the basement. Tr. 515-517, 522, 558-559, 564. J.K.'s in-court testimony was brief and did not implicate Canales by name; he stated only that his mother was "mean" and "whooped us." Tr. 592-593, 603. The convictions on Counts 1 and 2 did not rest on J.K.'s testimony, and his testimony added nothing to the proof on those counts that was not independently established by the testimony of the older two children, the daycare teacher, the CCDCFS investigators, and the recorded forensic interviews. Any conceivable error in

admitting J.K.'s testimony therefore could not have affected the outcome as to the counts of conviction.

{¶ 48} The trial court did not abuse its discretion in finding J.K. competent to testify, and in any event no prejudice resulted from his testimony as to the counts on which Canales was convicted.

{¶ 49} Therefore, Canales's second assignment of error is overruled.

{¶ 50} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

ANITA LASTER MAYS, JUDGE

LISA B. FORBES, P.J., and
MICHAEL JOHN RYAN, J., CONCUR